IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| FIRST PENN-PACIFIC LIFE INSURANCE COMPANY, Plaintiff | : : : : | |
| v. | : : | Civil No. AMD 05-444 |
| WILLIAM R. EVANS, CHARTERED, et al., Defendants | : : : | |

...o0o...

MEMORANDUM OPINION

In this diversity case presenting issues of first impression under Arizona law, plaintiff First Penn-Pacific Life Insurance Company ("First Penn") seeks rescission of a $2 million life insurance policy which was obtained from First Penn by the insured through the execution of a scheme to defraud plaintiff and numerous others.[1] "[F]raud is obnoxious." *Feierman v. Eureka Life Ins. Co. of Baltimore*, 124 A. 171, 172 (Pa. 1924)(internal quotation omitted). Nevertheless, I am persuaded that, under the circumstances presented here, the Arizona Supreme Court would very likely permit the fraud to go unremedied; accordingly,

---

[1] This is the second of two lawsuits instituted by First Penn in respect to the disputed policy. The first case was dismissed on the ground of abstention in light of ongoing state receivership proceedings arising from the insolvency of the Maryland viatical settlement company, Answer Care, Inc., that was the ultimate assignee of the disputed policy. *See First Penn-Pacific Life Ins. Co. v. Evans,* 304 F.3d 345, 346 (4th Cir.2002), *aff'g*, 162 F. Supp.2d 423 (D. Md. 2001). First Penn instituted the present action after I denied its motion to reopen the first suit. *See* 2006 WL 2008912 (4th Cir. 2006)(vacating and remanding order refusing to reopen first suit). As discussed in text, I conclude that the earlier action was filed too late and that First Penn is not entitled to relief. Thus, First Penn is likewise not entitled to relief in this action, although it was seasonably filed after the termination of the ongoing state proceedings. *Cf. id*.

I shall decline to order rescission of the policy.

I.

As recounted herein, there is no genuine dispute of material fact as to the nature and character of the scheme to defraud which resulted in the issuance and delivery of the subject policy of insurance, nor as to the specifics of the fraud practiced upon First Penn.

In or about September 1997, Stanley Moore, a 51-year-old resident of Arizona, undertook the scheme, which was designed to enable him falsely to represent that he suffered from a terminal illness, and thereby to permit him to "viaticate" numerous insurance policies he purchased on his own life.[2] At the commencement of the scheme, Moore underwent an

---

[2] A "viatical" or "viatical settlement" is "an investment contract pursuant to which an investor acquires an interest in the life insurance policy of a terminally ill person – typically an AIDS victim – at a discount of 20 to 40 percent, depending upon the insured's life expectancy." *Sec. & Exch. Comm'n v. Life Partners, Inc.*, 87 F.3d 536, 537 (D.C. Cir. 1996). Upon the death of the insured, "the investor receives the benefit of the insurance." *Id.*; *see also Wilbanks v. Wolk*, 121 Cal.App.4th 883, 17 Cal.Rptr.3rd 497 (1st Dist. 2004):

> According to a 2001 article in Forbes Magazine, viaticals are arrangements that allow dying persons with life insurance policies to sell their policies to investors for a percentage of the death benefits. As a practical matter, the sooner the viator dies, the greater the return on the investment. In the meantime, the viator obtains funds to pay for medical care or other expenses. Viatical settlement firms provide the capital used to purchase the policies, typically receiving a fee of 20 to 30 percent of the amount of the death benefits. The policies are sold through independent sales agents, or brokers, such as plaintiffs here. The agents or brokers can receive sales commission of 9 percent or more. (Coolidge, *Death Wish* (Mar. 19, 2001) Forbes Magazine, at p. 206.).

There has been substantial criminal and civil litigation arising from the fraudulent activities known to occur in the viatical settlement industry. *See, e.g., Liberte Capital Group, LLC v. Capwill*, 462 F.3rd 543 (6th Cir. 2006); *Wuliger v. Kelco, Inc.*, 2006 WL 51126 (S.D.Ohio, Jan. 6, 2006). It has been observed that the "risk of fraud" is "somewhat common in the viaticals business." *People ex rel. Wood v. Innovative Financial Services, Inc.*, 2006 WL 392030, *3 (Cal.App. 4th Dist., Feb. 17, 2006)(unreported); *and see United States v. Sutherlin*,

(continued...)

examination by his personal physician, Dr. Michael Hovan, in the course of which he asked Dr. Hovan to falsify his medical records to state he had a terminal illness. Dr. Hovan refused to do so and he noted the request in Moore's medical records. Moore also asked Dr. Hovan to complete a form ("Physician's Letter of Competency") available on the Internet, www.vspi.com/New%20Web%20Apps%205-9-02/KY.App.pdf (last visited June 7, 2007), which is needed to sell a life insurance policy to a viatical settlement company.

Thereafter, Moore began to apply for life insurance policies. On November 13, 1997, Moore applied for a $2 million life insurance policy from First Penn and an additional $2 million in life insurance from Transamerica Occidental Life Insurance Company ("Transamerica"). The agent for both of these applications was Stuart Daniels, a general agent , i.e., one authorized to solicit policies on behalf of numerous insurers, who was affiliated with the brokerage firm of Total Financial and Insurance Services, Inc. ("Total Financial"). In his First Penn application, Moore certified that: (1) he earned $250,000 per year through self-employment; (2) the only other life insurance he had in force was a policy with Transamerica for $500,000 that had been in force since 1994; and (3) he had not applied for life insurance with any other company in the 90 days immediately preceding his

---

[2](...continued)
2004 WL 2940821, **1 (6th Cir., Dec. 21, 2004)(affirming convictions of viatical schemers and rejecting argument that "the district court should have instructed the jury to consider the alleged fraudulent practices within the viatical insurance industry," and ruling that "[t]he district court properly rejected the defendants' 'viatical industry' instruction [as] [e]ssentially, the defendants asked the trial court to instruct the jury that fraud may be acceptable so long as others in the business are also committing fraud."), *cert. denied*, 126 S.Ct. 391 (2005).

application with First Penn. Moore did not disclose his same-day Transamerica application.

Several weeks later, on or about December 4, 1997, Moore applied for two additional life insurance policies, using an agent other than Daniels.[3] He did not fully disclose his other pending applications in those applications. Then, on or about December 15, 1997, Moore applied for three additional policies using still other agents.[4]

In connection with his First Penn application, Moore faxed his medical records to First Penn. Moore removed Dr. Hovan's note and the Physician's Competency Statement (which Dr. Hovan had refused to falsify) from the records. After considering the faxed medical records and evaluating the application, First Penn declined Moore's application on the basis of an unfavorable blood screen, i.e., elevated PSAs.

Meanwhile, also in December 1997, both Jackson National and Transamerica approved Moore's applications and issued policies to Moore. On December 30, 1997, a representative of Total Financial called First Penn on Moore's behalf and informed First Penn that Moore had applied for a policy with Transamerica. (In fact, the Transamerica policy had already been issued at this point.) The caller told First Penn's underwriter that the

---

[3] Specifically, Moore applied to Jackson National Life Insurance Company for $500,000 in life insurance and to Valley Forge Life Insurance Company for $500,000 in life insurance.

[4] Specifically, Moore applied for the following policies: (1) a 10-year term policy with a $1 million death benefit from Midland Mutual Life Insurance Company; (2) a $500,000 10-year term policy from Federal Kemper Life Assurance Company; and (3) a 10-year term policy with a death benefit of $1 million from Lincoln Benefit Life Insurance Company. Moore did not fully disclose his other applications with any of these applications. He did not complete the Kemper application until later, but when he did he failed to disclose his other applications and in force policies.

lab results for the Transamerica application were more favorable than those relied on by First Penn and requested that First Penn reconsider Moore's application.

First Penn reconsidered Moore's application as requested and, on January 5, 1998, First Penn approved Moore's application, but with a "standard" rating rather than the "preferred" rating contemplated in the November 13, 1997, application. Thus, Moore was required to amend his November 13, 1997, application to reflect that a policy was being offered at a higher premium. The amendment required that Moore certify that the information in his November 13, 1997, application remained true and accurate. Moore executed the amendment on January 27, 1998, but before he did so, two additional policies that Moore had applied for in December 1997 had been issued, as Moore well knew. Thus, in executing the amendment, Moore did not disclose the fact that as of January 27, 1998, he had in force policies that totaled $4 million in insurance on his life. (He also did not reveal that he had two other applications still pending.) The record shows indisputably that if Moore had made this disclosure, First Penn would not have issued the policy that is the subject of this dispute.

On the same day that First Penn approved his amended application (January 5, 1998), Moore met with a viatical broker, Laura Clarkson, for the purpose of negotiating the sale of all or some of his policies. By early February 1998, Clarkson had found a buyer, Kelco, Inc. ("Kelco"), for the Transamerica and Jackson National policies. Kelco's agreement to purchase those policies was contingent upon Moore converting those policies from 10-year

level term policies to 20-year level term policies. Moore was also issued the Federal Kemper policy at about this time.

The next day, Moore requested the re-issuance of the First Penn policy as a 20-year level term policy. First Penn agreed to do so and re-issued the policy on February 5, 1998. The delivery notice accompanying the First Penn policy contained standard language about the obligation to report changed circumstances. As required by Arizona law, the First Penn policy contained an incontestability provision, which provided that "[e]xcept for nonpayment of premiums, the validity of this Policy will not be contestable after it has been in force during the lifetime of the Insured for 2 years from the Issue Date."

Moore also converted his other policies to 20-year level term policies. On March 6, 1998, Clarkson contacted Kelco about selling the First Penn and Kemper policies; eventually, Kelco purchased both policies. Kelco then sold three of the policies, i.e., the First Penn policy, the Jackson National Policy and the Kemper Policy, to Answer Care, Inc. ("Answer Care"), a Maryland viatical settlement company, for whom one of the agents was defendant William R. Evans, Chartered, an insurance brokerage ("Evans"). Evans became the owner of the First Penn policy for the benefit of Answer Care and promptly effected a change of beneficiary. Consistent with Moore's scheme, the Policy Funding Agreements between Kelco and Answer Care for all the policies falsely describe Moore as "terminally ill."

In all, between November 13, 1997, and December 15, 1997, Moore applied for at

least seven life insurance policies, all of which were issued between December 19, 1997, and February 20, 1998, and thereby he obtained a total of $8.5 million in coverage. Moore viaticated six of these policies having a total face value of $8 million. On March 8, 1998, Moore submitted another application to First Penn, this time disclosing his First Penn and Transamerica policies. First Penn rejected this application based on its conclusion that Moore was over-insured.

In May 1999, First Penn learned that the Transamerica policy had been transferred to a viatical settlement company. First Penn investigated whether Moore was terminally ill and discovered that Moore had altered and omitted medical records during the underwriting process, including Dr. Hovan's note. First Penn discovered no evidence of terminal illness. Later, in early October 1999, First Penn's reinsurer discovered Moore's scheme and informed plaintiff. On October 12, 1999, First Penn sent letters to Evans and to Moore giving notice of rescission and tendering a check refunding all premiums paid on the policy. Kemper, Midland Mutual, Lincoln Benefit, and Valley Forge also rescinded their policies. Although the parties dispute whether Evans ever effectively accepted the refund of premiums and thereby ratified the rescission of the First Penn policy, the record shows that there has been no acceptance of the refund of premiums and that defendants have consistently rejected the attempted rescission.[5]

---

[5] Although Evans endorsed the check to the order of Answer Care, Inc., the beneficial owner of the policy, Answer Care never manifested an intention to accept the refund of
(continued...)

Moore died of gunshot wounds to the head in May 2004.

## II.

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Fourth Circuit has explained that "summary judgment should be granted in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law." *Miller v. FDIC*, 906 F.2d 972, 973-74 (4th Cir. 1990).

A motion for summary judgment is properly granted when there are no "material" disputes of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A factual dispute is material only when the resolution of that dispute might affect the outcome of the case. *See id.* "[I]rrelevant or unnecessary" factual disputes are insufficient to permit a question to go to the jury *Id.* Here, there are no disputes of material fact. The only inquiry is which party is entitled to judgment as a matter of law.

The parties agree that under the principle of *lex loci contractus*, which requires that the construction and validity of a contract be determined by the law of the place where the contract is made, Arizona law applies to this case. Furthermore, where, as here, a federal court exercising its diversity of citizenship jurisdiction must determine an issue of state law

---

[5](...continued)
premiums and, through its attorney, disputed First Penn's attempt to rescind the policy.

in the absence of binding precedent from the state's highest court, the federal court must "predict" how a state's supreme court is most likely to rule on the issue. *Doe v. Doe*, 973 F.2d 237, 240 (4th Cir. 1992); *and see Wade v. Danek Medical, Inc.*, 182 F.3d 281, 286 (4th Cir. 1999)("In the absence of any relevant Virginia law, we naturally look to the practices of other states in predicting how the Virginia Supreme Court would rule.").

### III.

Arizona law provides that a challenge to the validity of an insurance contract is barred two years after the policy issue date. Ariz. Rev. Stat. § 20-1204.[6] The First Penn policy mirrors the statutory language, providing that "[e]xcept for nonpayment of premiums, the validity of this Policy will not be contestable after it has been in force during the lifetime of the Insured for 2 years from the Issue Date." The parties agree that the issue date of the First Penn policy is February 5, 1998. Thus, First Penn was statutorily and contractually obligated to "contest" the policy, if at all, on or before February 5, 2000.[7]

---

[6] The Arizona statutory provision reads as follows:
There shall be a provision that the policy, exclusive of provisions relating to disability benefits or to additional benefits in the event of death by accident or accidental means, shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of two years from its date of issue.
Ariz. Rev. Stat. § 20-1204.

[7] First Penn has asserted a separate count in its complaint for declaratory relief in which it asserts that the policy is invalid on the ground that Moore lacked an insurable interest. It further asserts that under Arizona law, lack of insurable interest is a ground for rescission that is not cabined by the incontestability statute.
Where an insurance policy is purchased by a person without an insurable interest in the life being insured, the policy is void. *See, e.g.*, *Paul Revere Life Ins. Co. v. Fima*, 105 F.3d 490,
(continued...)

---

⁷(...continued)
492 (9th Cir. 1997); *Ky. Cen. Life Ins. Co. v. McNabb*, 825 F. Supp. 269, 272 (D. Kan. 1993); *Beard v. Am. Agency Life Ins. Co.*, 314 Md. 235, 258 (1988); 2 John A. Appleman, Jean Appleman, *Insurance Law & Practice*, § 761 (1966). An "insurable interest" is "a lawful and substantial economic interest in having the life, health or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the individual insured." Ariz. Rev. Stat. Ann. § 20-1104(C)(2); *see also, e.g.*, *Grigsby v. Russell*, 222 U.S. 149, 154 (1911) (indicating a policy insuring a life in which the policy owner has no interest contravenes public policy because it creates an interest in ending the life of the insured individual). When an insurable interest is lacking, the policy would constitute a "wager policy." Wager policies are against public policy because they are "speculative contracts upon human life." *Warnack v. Davis*, 104 U.S. 775, 779, 782 (1877).

The Arizona insurable interest statute establishes that the an insured has an insurable interest in his or her own life. Ariz. Rev. Stat. § 20-1104 ("Any individual of competent legal capacity may procure or effect an insurance contract upon his own life or body for the benefit of any person"). First Penn acknowledges that Moore ordinarily would have an insurable interest in his life; it argues, however, that he did not have an insurable interest here because he intended to assign the policy at the time he applied for it. It is true that under Arizona law, where the insured is working together with an assignee to purchase a policy on his or her own life, but circumstances indicate that the assignee is the real purchaser of the policy, then there is a lack of an insurable interest. *See McKee v. Penick (In re Al Zuni Trading Co.)*, 947 F.2d 1403, 1405 (9th Cir. 1991) (interpreting Arizona law)(prohibiting "deliberate attempt to evade the requirement of an insurable interest"); *see also Travelers Ins. Co. v. Reiziz*, 13 F. Supp. 819, 820 (E.D.N.Y. 1935);*Grigsby*, 222 U.S. at 156 (drawing distinction between invalid assignments "in which a person having an interest lends himself to one without any as a cloak" and valid assignments "where an honest contract is sold in good faith").

That is not the situation here. I agree that the evidence shows indisputably that Moore planned to sell all or most of his life insurance policies at the time he applied for them, but the scheme did not involve other parties working together with him to procure policies and immediately effect their assignment. It is not enough that Moore intended to defraud others, i.e., investors, by falsely representing that he had a terminal illness. There is no evidence that anyone other than Moore was a participant in the scheme at the time Moore obtained the First Penn policy; at the time he procured the policy, he was entitled to do so. Once a policy has been issued, it is an asset of the insured and he or she is free to sell it. *See, e.g., Grisby*, 222 U.S. at 156-57 *But see Home Life Ins. Co. of N.Y. v. Masterson*, 21 S.W.2d 414, 416 (Ark. 1929) (holding that assignment of a life insurance policy to one not having an insurable interest in the life of the insured violates public policy if "at the time the policy was taken out, the insured intended to make such assignment.").

Although defendants argue that Moore made no material misrepresentations that would vitiate the First Penn policy, I would emphatically reject those arguments were I able to consider them.[8] Defendants' primary defense to the claims for rescission, however, is that First Penn failed to "contest" the policy within two years as required by the Arizona statute and the policy itself.

Two legal issues are presented in light of that defense. The first issue is whether

---

[8]In order to rescind an insurance policy under Arizona law, an insurer must prove that misrepresentations (including fraudulent omissions) in the application process are: (1)fraudulent; (2) material either to the acceptance of the risk, or to the hazard assumed by the insurer; and (3) that the insurer in good faith would either not have issued the policy, or would not have issued the policy in as large an amount. *Russell v. Royal MacCabees Life Ins. Co.*, 974 P.2d 443, 450 (Ariz Ct. App. 1999); Ariz. Rev. Stat. § 1109. The first prong of this test may be satisfied by a showing of either actual or constructive fraud. *See Royal MacCabees*, 974 P.2d at 450. The second prong, materiality, requires that the "true facts" might have influenced a reasonable insurer in deciding whether to accept or reject the risk. *See Cent. Nat'l Life Ins. Co. v. Peterson*, 529 P.2d 1213, 1216 (Ariz. Ct. App. 1975). The third prong is self-evident. I would conclude as a matter of law that when Moore falsely attested in the January 27, 1998, amendment to his November 13, 1997, application that he had only $500,000 life insurance in force, rather than the fact that he then had $4,000,000 life insurance in force (16 times his declared annual income, and more than five times his declared net worth), he committed a fraudulent representation material to First Penn's decision to issue the policy, and that First Penn would not have issued the policy had the fraudulent misrepresentation not been made.

Defendants argue that even if the incontestability provision did not bar the claims to rescission, First Penn should only be permitted to proceed on the theory it raised in the rescission letter. *See, e.g., Feierman v. Eureka Life Ins. Co.*, 124 A. 171 (Pa. 1924); *Steigler v. Eureka Life Ins. Co.*, 146 Md. 629, 402 (1925) (discussed *infra* in text). Therefore, defendants argue, the only ground for rescission that might proceed is Moore's statements in his November 13, 1997, application regarding whether he had applied for life insurance in the preceding 90 days. I would reject this facile argument, however, and conclude that First Penn's failure to mention the amendment specifically in its October 12, 1999, letter is of no moment; it mentioned the *application* for the policy, which included the *amendment thereto*. When an applicant renews or reapplies for a policy without a new application, the applicant must certify a statement that the facts in the original application are still true. *See Keplinger v. Mid-Century Ins. Co.*, 565 P.2d. 893, 897 (Ariz. Ct. App. 1977). The First Penn application specifically notes this requirement.

Arizona's incontestability doctrine requires that a *judicial action* be in existence within two years of the policy issue date, or rather, whether some action short of the insurer's institution of a lawsuit (or the assertion by the insurer of an equitable defense in a lawsuit instituted by the insured), e.g., notice of rescission coupled with a tender of premiums, is ever sufficient to constitute a "contest" within the period of contestability. If the answer to the first question is "yes," then the second issue is whether First Penn's letters giving notice of rescission (together with the tender of premiums) were sufficient in this instance to permit First Penn to seek rescission of the policy in a subsequent judicial action filed during the period of incontestability. In the view that I take of this case, I need not reach the second issue because I predict that the Supreme Court of Arizona is most likely to answer the first question in the negative.

      It is undisputed that First Penn did not file a judicial action seeking rescission of the policy until March 6, 2001, well outside the two year period of contestability. However, upon learning of Moore's fraudulent scheme and that its policy had been issued in consequence of that scheme, First Penn sent letters dated October 12, 1999, within the two-year period of contestability, to Moore, purporting unilaterally to rescind the policy, and to the then owner of the policy, Evans, giving notice of the purported rescission and enclosing a check for $21,574.98, representing the amount of paid premiums plus interest. The letter to Evans provided as follows, in pertinent part:

> This letter is to inform you that the First Penn-Pacific Life Ins. Company *is rescinding all life insurance coverage* under Policy T101158758, which you

> own on the life of Stanley R. Moore, with a policy date of January 15, 1998.
>
> In accordance with our standard procedure, a letter with full details regarding the reason for our action has been sent to Stanley R. Moore. We suggest you contact him for this specific information. Enclosed is a check for $21,574.98 representing a refund of all premiums paid + 4% interest.(Emphasis added.)

The letter delivered to Moore stated the following, in pertinent part:

> This letter is to inform you that the First Penn Pacific Life Insurance Company *is rescinding all life insurance coverage on your life* under policy T101158758, owned by William R. Evans, with a policy date of January 15, 1998.
>
> Our action *was based* on information we received after your policy was issued. . . . Please refer to Number 4 on Page 4 of Part 1 [of the "application agreement."] Number 4 states: When I accept the policy, the state of health of the proposed insured or any other factor which affects insurability must be the same as set forth in this application.
>
> We have . . . learned that between November 13, 1997 and January 5, 1998, you made multiple applications [to] other life insurance companies, for life insurance coverage on yourself, for face amounts totaling $4,000,000. These policies eventually went inforce [sic]. We consider these multiple applications, and subsequent policies totaling $4,000,000 a factor which affects your insurability. Based on the amount of earned income you reported on the application, $250,000, and your personal net worth of $740,000 you reported during the 12/4/97 inspection report, these additional policies, totaling $4,000,000 in face amount, create a significant overinsurance situation. If we had known on January 5, 1998 that you had made multiple applications totaling $4,000,000 in face amount, we would not have issued your policy and sent it out for delivery.
>
> Therefore, *we are rescinding all life insurance coverage* that exists under policy T101158758, which William R. Evans owns on your life . . . . (Emphases added.)

Thus, the parties have joined issue over whether First Penn's attempt unilaterally to rescind the policy issued to Moore by letter (coupled with a refund of premiums) is sufficient under

Arizona law to constitute a "contest" under the Arizona incontestability doctrine.

The Arizona Supreme Court has never considered whether the existence of a judicial action within the period of contestability is an absolute precondition to a "contest" under the Arizona incontestability doctrine. *Nat'l Life & Cas. Ins. Co. v. Blankenbiller*, 360 P.2d 1030 (Ariz. 1961), is the most salient precedent, but is of scant authoritative value. On the one hand, while acknowledging that the *Blankenbiller* court did not expressly require the filing of a judicial action, defendants argue that the cases cited approvingly by the *Blankenbiller* court make this point. On the other hand, First Penn emphasizes that the *Blankenbiller* court observed that, to avoid the bar of an incontestability provision, an insurer need only "take such action as will protect its rights" within the period of contestability.[9] Any commonsense understanding of this language would comfortably encompass an insurer's use of a letter (accompanied by a tender of premiums plus interest) giving notice that the policy was rescinded. But the above language was mere *obiter dicta* in *Blankenbiller* because in that case, the insurer "raised the issue of fraud over two years after . . . the incontestability statute [barred the defense]." *See* 360 P.2d at 1032.[10] Ultimately, the court affirmed a judgment in

---

[9]The court reasoned as follows:
The nearly unanimous decisions of the courts are to the effect that the company is given, under the incontestability clause, a reasonable period of time to check into and to ascertain the truth of the declarations made by the applicant and *to take such action as will protect its rights*. If it fails to do so then this defense is barred.
360 P.2d at 1032 (emphasis added).

[10]The full statement of the court is: "By alleging that the death resulted from a prior illness and that necessarily the statements made on the application are false, the defendant raised
(continued...)

favor of the plaintiff/beneficiary who had sued the insurer, holding that the incontestability statute barred the defense of fraud.

In the life insurance industry, incontestability statutes seek to protect both insurance companies and, most importantly, beneficiaries, the latter from unexpectedly (and without an opportunity to make alternative plans) losing insurance benefits years after the policy has been procured. *Cf. Mutual Life Ins. Co. v. Ins. Comm'r,* 723 A.2d 891, 885 (Md. 1999)("The purpose of incontestability clauses is to protect insureds and beneficiaries.").[11] Here, Evans (the then owner of the policy) was aware well within the two year period of contestability that the insurer had declared the policy rescinded. Nevertheless, defendants point to the many cases arising under the law of jurisdictions other than Arizona (or Maryland) that embrace the majority rule holding that an insurer must either initiate a judicial action within the period of contestability, or, alternatively, respond appropriately within the period of contestability to such a suit instituted against it on the policy, to protect its right to avoid liability on the policy. *See* Annotation, WHAT AMOUNTS TO CONTEST WITHIN CONTEMPLATION OF INCONTESTABLE CLAUSE, 95 A.L.R.2d 420, § 2 (1964)("By the great

---

[10](...continued)
the issue of fraud over two years after the last reinstatement contrary to the incontestability statute." *Id*.

[11]One particularly lucid review of the origins and historical development of the incontestability doctrine in the life insurance industry can be found in *Protective Life Ins. Co. v. Sullivan*, 682 N.E. 2d 624, 628-34 (Mass. 1997)(collecting cases). In *Sullivan*, an AIDS victim successfully manipulated the incontestability doctrine to viaticate a fraudulently-obtained life insurance policy on his own life.

weight of authority, a contest, within the meaning of an incontestability provision in an insurance policy, means some affirmative or defensive action taken in court to cancel the policy or prevent its enforcement, to which the insurer and the insured, or his representatives or beneficiaries, are parties, within the time prescribed by the provision."); *and see e.g., Franklin Life Ins. Co. v Bieniek* 312 F.2d 365, 95 (3rd Cir.1962)(applying Pennsylvania law and holding that notice of invalidity and tender of premiums insufficient).

So far as I have been able to determine, not only is there a "majority rule" that the existence of a judicial action during the period of contestability is an absolute precondition to a claim for rescission of a life insurance policy, but the Court of Appeals of Maryland seems to be the *only court* to have considered the issue and yet opted for the "minority rule," i.e., that the existence of a lawsuit within the period of contestability is not invariably required. *See Steigler v. Eureka Life Ins. Co.*, 127 A. 397, 400-02 (Md. 1925) (reasoning that an insurer may communicate its intent to rescind a policy either by initiating litigation or "by some definite or conclusive word or act"). In *Steigler*, the court held that a communication was sufficient if, without unreasonable delay after the fraud was discovered, the insurer sent notice to the insured that the policy was rescinded, and attempted to refund all premiums. *See id.* The court reasoned as follows, in part:

> This court is unable to agree that the recission of a contract procured by deceit in a material matter cannot be effected on its discovery by the defrauded party except through litigation, unless the defrauded party obtain the consent of the wrongdoer. The doctrine of recission does not depend upon such an illusory and unstable basis as the concurrence of the defrauding party, but is the personal right of the victim of the fraud to be exercised or not of his own

> independent volition. A proceeding at law or in equity to enforce the rescission of a contract is not of itself a rescission, but is the result of a precedent act or election to rescind, and is a method of communicating that fact to the defendant.

*Id*. at 401. Of course, the substantive law of Maryland does not apply in this case.[12]

Upon full reflection on the matter, I am persuaded that the Supreme Court of Arizona is most likely to join those courts which have adopted the majority rule. In short, "[t]he insurer, within the period prescribed by the policy, must contest the policy, that is, must set up its invalidity in some judicial proceeding, by way either of attack or of defence [sic]." *Protective Life Ins. Co. v. Sullivan*, 682 N.E. 2d 624, 633 (Mass. 1997) (quoting *Metropolitan Life Ins. Co. v. DeNicola,* 317 Mass. 416, 418, 58 N.E.2d 841 (1944)). Accordingly, I am constrained to conclude that First Penn's claim to rescission is barred by the incontestability provision of the policy.[13]

---

[12] Notably, in adopting the minority view that judicial action within the period of contestability is not an absolute requirement, the *Steigler* court relied in part on *Feierman v. Eureka Life Ins. Co. of Baltimore*, 124 A. 171 (Pa. 1924), *see* 127 A. at 402, which had reasoned in like fashion. However, the language in *Feierman* on which the Maryland court relied was later understood by courts applying Pennsylvania law as mere *obiter dicta*; Pennsylvania applies the majority rule. *See Franklin Life Ins. Co. v Bieniek* 312 F2d 365, 95 (3rd Cir.1962).

[13] Defendants also argue that they are entitled to summary judgment on the ground that First Penn waived its rescission claims because it was negligent in evaluating the Moore application and that the First Penn underwriters and/or its general agent knew or should have known all the correct information surrounding Moore's application before it issued the policy. Arizona courts have not specifically addressed this issue, but the overwhelming weight of authority holds that an insurer generally does not have an obligation to investigate the truth of statements made in an application for insurance. *See Miguel v. Metro. Life Ins. Co.*, 2006 WL 2971331 (11th Cir., Oct. 18, 2006) (rejecting argument, under Florida law, that insurer waived right to rescind by failing to conduct adequate investigation; insurer has no duty to investigate truth of application); *Chawla v. Transamerica Occidental Life Ins. Co.*, 440 F.3d 639, 647 (4th

(continued...)

IV.

For the reasons set forth above, plaintiff's motion for summary judgment shall be denied and defendants' motion shall be granted.[14] An appropriate Judgment Order follows.


Filed: June 21, 2007                                  /s/
                                               ANDRE M. DAVIS
                                               UNITED STATES DISTRICT JUDGE

---

[13](...continued)
Cir. 2006) ("As a general matter, Maryland law does not impose on insurers a duty to investigate insurance applicants."); *Philip v. Jackson Nat'l Life Ins. Co.*, 1997 WL 90370, *3 (9th Cir., Feb. 27, 1997) ("An insurer may rescind an insurance contract for material misrepresentations even if the insurer issued the policy without investigating the applicant's medical history."); *Verex Assurance, Inc. v. John Hanson Sav. & Loan, Inc.*, 816 F.2d 1296, 1305 (9th Cir. 1987) ("Generally, under Oregon law, an insurer may rely upon representations by an applicant for insurance, even if the insurer was negligent in failing to investigate the insured"). There has been no waiver here.

[14]First Penn's contention that consideration of the incontestability issue is barred, under the doctrine of "law of the case," by my earlier denial of defendants' motion to dismiss filed pursuant to Fed.R.Civ.P. 12(b)(6) is untenable. *See, e.g., American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 513-15 (4th Cir. 2003).